## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ROCCO L. ROGERS, | ) | CASE NO. 4:25-CV-120 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Rocco L. Rogers's application for a period of disability and Disability Insurance Benefits (DIB). Mr. Rogers seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated January 23, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

In February 2022, Mr. Rogers applied to the Social Security Administration (SSA) seeking a period of disability and DIB.[2] (Tr. 209.) He claimed that he became disabled on November 20, 2021. (*Id.*) He identified five allegedly disabling conditions: (1) "stomach virus"; (2) "bowel virus"; (3) "digestive medical issues"; (4) depression; and (5) anxiety. (Tr. 229.)

---

[1] Michelle King was serving as Acting Commissioner of Social Security when the complaint was filed. She served in that role until February 2025. Acting commissioners led the Agency until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 37"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 925").

The SSA denied Mr. Rogers's application initially and upon reconsideration. (Tr. 110, 111, 121, 126, 141.) Mr. Rogers requested a hearing before an administrative law judge (ALJ). (Tr. 142.) The ALJ held a hearing on September 14, 2023, at which Mr. Rogers was represented by counsel. (Tr. 74–104.) Mr. Rogers testified, as did an independent vocational expert. (*Id.*)

On December 6, 2023, the ALJ issued a written decision finding that Mr. Rogers is not disabled. (Tr. 14–38.)

Mr. Rogers requested review of the ALJ's decision. (Tr. 204–05.) His counsel filed a brief identifying alleged errors in the ALJ's decision. (Tr. 291–94.) On December 16, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On January 23, 2025, Mr. Rogers filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Rogers asserts the following assignment of error for review:

> The ALJ's RFC determination is unsupported by substantial evidence because the ALJ failed to duly explain how Plaintiff's severe impairment of pelvic floor dysfunction resulted in the current RFC limitations without further limitations.

(Pl.'s Merit Br. at 8, ECF No. 8, PageID# 925.)

III.    **BACKGROUND**[3]

A.    **Personal, Educational, and Vocational Experience**

Mr. Rogers was born in July 2000 and was 21 years old on the date of his application. (*E.g.*, Tr. 77, 209.) He graduated high school. (Tr. 81.) He worked for a retail store for about year from 2019 to 2020, at which point he began working as a driver for a mobile food delivery service. (Tr. 81–82.) He worked for that service until 2021. (Tr. 83.) He has a driver's license and is able to drive. (Tr. 80–81.) He lives with his mother, his brother, and his stepfather. (Tr. 80.)

B.    **Function Reports**

In conjunction with his application, Mr. Rogers wrote to the Agency that he was "dealing with a stomach virus" that caused him to "be sick everyday" such that he "cannot physically do most activities throughout the day." (Tr. 207.) He wrote that the condition "has been steadily getting worse for months," to the point that he is not able to work. (Tr. 207–08.) Shortly thereafter, he explained that he was "currently very sick" and that his "condition is getting worse with time." (Tr. 234.) He wrote that he has "digestive and bowel issues that have caused it very hard to have a bowel movement ever," causing him to feel nauseous and sick most days. (*Id.*) He said that he "cannot do anything basically and am stuck at home with pain and nausea most days." (*Id.*)

Mr. Rogers completed a function report on April 20, 2022. (Tr. 237–45.) He described that he was in chronic pain caused by bowel issues throughout the day, such that every hour or two he needs to be in the restroom trying to address the issue. (Tr. 237.) He uses enemas, usually without success. (Tr. 239.)

He said that he spends most of his days cleaning and doing chores around the house for his mother. (Tr. 239.) If he is not feeling sick, he will take a walk or go to a gym to stretch in the

---

[3] As Mr. Rogers's assignment of error is limited to the exertional limitations stemming from his pelvic floor dysfunction, I limit my summary of the evidence to that relevant to that condition.

morning. (*Id.*) He wrote that he was in pelvic floor therapy, which requires daily stretches. (*Id.*) On days that he is not sick, he will cook dinner for his family. (Tr. 239–40.) He also cleans the kitchen and the bedroom, does laundry, and helps with the trash, although he finds that everything takes longer than it used to because of his bowel condition. (Tr. 240.)

Mr. Rogers takes care of his parents and their family pets (cats and dogs), including by taking them outside to relieve themselves. (*Id.*) His brother helps care for the pets. (*Id.*)

He cannot do any physical activity or socialize because of his pain. (*Id.*) But most days he takes a walk, and he is able to drive a car. (Tr. 241.) He is able to go out alone and shops weekly for groceries for his family. (*Id.*) Mr. Rogers enjoys watching sports on television and working out, although he is limited to light exercises when he is feeling sick. (Tr. 242.) He is able to socialize with his brother and mother. (*Id.*)

Mr. Rogers's chronic pain limits him from "doing anything physical"; he has trouble lifting heavy objects and has found that he has lost muscle weight. (Tr. 243.)

In summarizing his condition, Mr. Rogers explained that his conditions have "severely changed [his] life." (Tr. 245.) He cannot go out or socialize, even with his family who live locally. (*Id.*) He is sad that he is losing his relationships, and he is worried about bills because he is not working. (*Id.*) The pain makes it difficult to sleep. (*Id.*)

After the initial level review, Mr. Rogers reported "increased intestinal pain." (Tr. 249.)

### C.    <u>Relevant Hearing Testimony</u>

#### 1.    *Mr. Rogers's Testimony*

Mr. Rogers testified that he began having trouble moving his bowels in 2020 or 2021. (Tr. 83–84, 87.) He began having chronic pain as a result, which caused him to stop driving for the mobile food-delivery service about six months later. (*Id.*)

4

Mr. Rogers described pain "inside [his] pelvic area" on the inside and the outside, as well as abdominal pain. (Tr. 85.) It is "24/7" and ranges from "soreness to tightness to sharpness to burning." (Tr. 95.) He said he is "in and out of the bathroom about all day." (Tr. 86.) He described spending an hour in the bathroom after he wakes up, during which he takes suppositories and "lay[s] on pads." (Tr. 86.) A couple hours later, he spends another hour in the bathroom. (*Id.*) An hour later, he lays down again for another hour. (Tr. 86–87.) After dinner in the evening, he spends another hour in the bathroom. (Tr. 87.) In between these longer stretches in the bathroom, he is "in and out" trying to relieve the pain and pressure, although he does not find much relief. (*See* Tr. 85–87.)

The ALJ asked Mr. Rogers to describe the day before the hearing. Mr. Rogers woke up and spent a little over an hour in the bathroom. (Tr. 90–91.) He then went downstairs for a moment to prepare coffee for the day, before returning to the bathroom. (Tr. 91.) He then went back downstairs and, for a couple hours, stretched and engaged in diaphragmatic breathing (*Id.*) He then returned to the bathroom and used suppositories and pads. (*Id.*) He then ate breakfast and returned to the bathroom. (Tr. 91–92.) His brother thereafter used a "pelvic therapy gun" around Mr. Rogers's pelvis and buttocks for around 20 to 30 minutes. (Tr. 92.) Mr. Rogers then sat on the couch in his brother's room, watched television, and tried to relax. (Tr. 92–93.) He then went to the kitchen and ate lunch, after which he returned to the bathroom for another hour, using suppositories. (Tr. 93.) His brother then used the muscle-therapy gun again for about 20 to 30 minutes, after which Mr. Rogers continued stretches. (*Id.*) Mr. Rogers then soaked in a hot bath, took a shower, and ate dinner in his brother's room. (Tr. 93–94.)

Mr. Rogers never goes to the grocery store. (Tr. 94.) He barely cooks, although his is able to make eggs sometimes. (*Id.*)

Mr. Rogers testified that he is supposed to do pelvic stretches every day. (Tr. 81.) When he is able to do that, he tries to go to the gym a couple days a week. (*Id.*)

Mr. Rogers initially testified that, most of the time, he is only able to go to the gym once a week, "if that." (*Id.*) But he said he made it to the gym the day before his hearing, staying for a half hour to complete stretching exercises. (Tr. 84.) He also made it to the gym three days before the hearing and six days before the hearing. (*Id.*) He then clarified that it is typical for him to go to the gym two to three times per week. (Tr. 84–85.)

He is only able to go to the gym in the morning, because after he starts eating, he finds that his pain gets worse and worse, to the point that he cannot "do much" except for move around the house. (Tr. 84, 89.)

Mr. Rogers testified that he had switched doctors several months before the hearing because his condition was getting worse and he wanted a second opinion to perhaps help him "progress . . . to get back to a normal life." (Tr. 85–86.) He acknowledged that his previous doctor, Dr. Spivak, advised him that his anxiety and depression could be contributing to his gastrointestinal symptoms. (Tr. 86.) At the time of the hearing, Mr. Rogers had an appointment to consult with a surgeon about the possibility of installing a colostomy bag. (Tr. 86, 95.) He underwent a Botox injection to his pelvic area, but the injection did not help. (Tr. 96.)

Mr. Rogers admitted that he had not consulted with a psychiatrist, psychologist, or counselor about his conditions. (Tr. 88.) His doctor "very much" wanted him to see someone, so he planned to make an appointment. (Tr. 88–89.)

Mr. Rogers uses marijuana nearly every day, but he had recently been working to cut down on his usage. (Tr. 90.)

In response to questions from his counsel, Mr. Rogers testified that if he were to make it to work at this point, his pain would cause him not to focus and he would have difficulty sitting for even ten minutes. (Tr. 96–97.) He would need his suppositories and pads to use the restroom and would need to be in the restroom for hours at a time. (Tr. 97.)

### 2. *Vocational Expert's Testimony*

Dr. Eric Dennison testified as a vocational expert (VE) at the hearing. (Tr. 97.) The VE categorized Mr. Rogers's past retail work as a composite position comprising the work of a cart attendant (DOT 920.687-014) and of a customer service representative (DOT 279.357-054). (Tr. 98–99.)

The ALJ then asked the VE to assume that an individual with Mr. Rogers's age and education had the ability to perform work with the following non-exertional limitations:

> Simple routine and repetitive tasks but not at a production rate pace such as assembly line work, simple work-related decisions, occasional interaction with supervisors and coworkers, none with the public, few changes in a routine work setting.

(Tr. 99.)

The VE testified that such a person could not perform Mr. Rogers's past work but could perform the work of a cleaner II, bagger (in the garment industry), or stuffer. (Tr. 99–100.)

The VE further testified that employers will tolerate employees being off-task up to ten percent of the time but will not tolerate employees who are absent more than one day per month on a consistent basis. (Tr. 100.)

In response to questions from Mr. Rogers's counsel, the VE testified that employers typically allow a 15-minute break early in an employee's shift, a half-hour break midway through the shift, and a 15-minute break later in the shift. (Tr. 101.) Any further breaks would be work-preclusive. (Tr. 101–02.)

The VE further confirmed that, if an employee could not be subject to "over-the-shoulder" supervision during a training period, that would be work-preclusive. (Tr. 103.) Further, a limitation requiring an employee to be completely isolated from others for five hours per day would be work-preclusive. (*Id.*)

### D.    State Agency Consultants

A disability examiner (Judith Thompson), a physician (Leon Hughes, M.D.), and a psychologist (David Dietz, Ph.D.) reviewed Mr. Rogers's claim at the initial review level. (Tr. 105–11.) Dr. Hughes opined that Mr. Rogers's physical conditions, including "gastritis and duodenitis," were not severe. (Tr. 107.) Dr. Dietz found that Mr. Rogers's psychological conditions were also not severe. (Tr. 108.) The consultants noted that Mr. Rogers's statements about his symptoms were only partially consistent with the record evidence, citing normal physical examination findings. (Tr. 109.) Based on these findings, the consultants opined that Mr. Rogers is not disabled. (Tr. 110.)

In a letter explaining this decision to Mr. Rogers, the SSA wrote that the evidence "shows you have abdominal pain and constipation" but "[y]ou are able to move about without assistance" and "perform your daily tasks and workout." (Tr. 126.)

A disability examiner (Ciara Perez), a physician (W. Scott Bolz, M.D.), and a psychologist (Robyn Murry-Hoffman, Psy.D.) reviewed Mr. Rogers's claim at the reconsideration level. (Tr. 112–21.) The consultants noted that additional medical records had been received at the reconsideration level. (Tr. 114.) Dr. Bolz identified that Mr. Rogers reported increased intestinal pain since the initial review. (*Id.*) However, Dr. Bolz opined that Mr. Rogers's physical condition remained not severe and noted that, even after reviewing the additional evidence, the initial level findings were affirmed. (Tr. 115.)

Dr. Murry-Hoffman opined that Mr. Rogers's mental health conditions were severe in light of the additional evidence presented and opined on several non-exertional limitations resulting

from those conditions. (Tr. 116–19.) Dr. Murry-Hoffman wrote that Mr. Rogers was "preoccupied [with] chronic health issues" and that his activities of daily living "revolve around perceived limitations," however he "prefers physical explanations [over mental health] ones." (Tr. 119.) She noted that his "somatic focus" magnifies his mental-health symptoms. (*Id.*)

Ultimately, the consultants affirmed that Mr. Rogers is not disabled. (Tr. 121.)

In a letter to Mr. Rogers explaining this decision, the SSA wrote that "you do have mild gastritis and chronic constipation" but "you have normal use of your upper and lower extremities, . . . are still able to complete normal activities without severe difficulty" and "your physical conditions are only mildly limiting . . . ." (Tr. 141.)

### E.    Relevant Medical Evidence

At an appointment with nurse practitioner Elizabeth Zinni on March 8, 2017, Mr. Rogers complained of constipation for a few years and rectal pain. (Tr. 315.) On examination, his abdomen appeared normal with normal bowel sounds, except that Mr. Rogers reported diffused tenderness to his lower abdomen. (*Id.*) Ms. Zinni noted that this appeared to be a "functional constipation" and recommended a laxative. (*Id.*) An x-ray examination was normal, and Mr. Rogers was cleared to participate in school sports. (Tr. 315–16.)

At an appointment on May 3, 2017, Mr. Rogers complained of left-sided upper abdominal discomfort. (Tr. 312.) On examination, his spleen was found to be slightly enlarged without evidence of hepatomegaly. (*Id.*)

At appointments with Dr. Zinni on February 6 and May 12, 2020, Mr. Rogers stated he had a good energy level and was sleeping well; he wanted to wean off his psychiatric medicine. (Tr. 311.) His abdomen was normal on examination. (*Id.*)

Mr. Rogers presented to Joey Annichine, a nurse practitioner, on December 10, 2021. (Tr. 310.) Mr. Rogers complained of ongoing abdominal pain and difficulty moving bowels despite

laxatives and stool softeners. (*Id.*) He described "intermittent" episodes of constipation and diarrhea. (*Id.*) He denied nausea but said he felt bloated. (*Id.*) On examination, Mr. Rogers was noted to have "hyperactive" bowel sounds and pain on palpitation of his abdomen. (*Id.*) Mr. Annichine noted that Mr. Rogers would soon undergo a CAT scan of his abdomen and pelvis and would be referred to general surgery to obtain a colonoscopy. (*Id.*)

Mr. Rogers underwent computed tomography imaging on January 3, 2022. (Tr. 301.) The scan showed stool but no bowel obstruction, free fluid, or inflammatory change since his previous images in May 2017. (*Id.*)

Mr. Rogers consulted with Alex Masters, a certified nurse practitioner at a gastroenterology practice, on February 1, 2022. (Tr. 305.) On examination, Mr. Rogers appeared healthy and well-nourished. (*Id.*) There were no visible herniations and apparent bowel sounds, and the abdomen was soft, nontender, and nondistended; there was no guarding, rigidity, rebound tenderness or organomegaly. (*Id.*) Mr. Masters made medication changes and ordered blood tests and an endoscopy. (Tr. 305–06.)

Mr. Rogers presented for the ordered endoscopy on February 16, 2022. (Tr. 307.) The procedure revealed "mild diffuse gastritis," leading to a recommendation of diet changes and omeprazole. (*Id.*) The surgical report notes "no significant pathologic changes" in the small bowel and "minimal chronic gastritis" in the stomach. (Tr. 308.)

On March 1, 2022, Mr. Rogers underwent pelvic floor testing with Carla Merrick, a certified nurse practitioner. (Tr. 420.) Mr. Rogers described that he felt like his "colon is not working" and said his symptoms had worsened. (*Id.*) On examination, Mr. Rogers appeared to be well-hydrated and well-nourished. (Tr. 421.) The examination was made difficult by "clenching," but Mr. Rogers was found to have a high ("well above normal range") resting and squeeze tone;

his floor relaxation was abnormal with poor pelvic floor descent. (Tr. 421–22.) Mrs. Merrick made medication changes and recommended pelvic floor therapy, which she wrote was "the most effective way to get the pelvic floor muscles moving and coordinating correctly." (Tr. 423.)

Mr. Rogers was evaluated for physical therapy on March 11, 2022. (Tr. 372.) Mr. Rogers reported that he was cleaning around the house and cooking, working out, and watching sports. (Tr. 373.) The therapist noted that Mr. Rogers presented with symptoms of "severe pelvic floor dysfunction, spasm, and weakness contributing to pain and difficulty with effective BM presenting to patient as constipation." (Tr. 376.)

On March 14 and 15, 2022, Mr. Rogers complained to his physical therapist that he had had a rough morning and complained of painful bowel movements, describing that he felt that stool was "stuck somewhere." (Tr. 364, 368.)

By March 18, 2022, Mr. Rogers was feeling a bit better. (Tr. 361.)

On March 21, 2022, Mr. Rogers was "feeling okay" and felt that his exercises had been helpful, although he was still using the restroom "too often." (Tr. 358.) The therapist noted that he needed two breaks during the session but demonstrated improvements in his overall flexibility, although he continued to struggle with core stability and contractions. (Tr. 359.)

At physical therapy on March 23, 2022, Mr. Rogers complained that it was "hard to manage day to day." (Tr. 354.) He noted that he had been feeling nauseous from the pain. (*Id.*) The therapist noted that Mr. Rogers displayed "poor awareness to body mechanics and overly taut musculature," although he responded well to the exercises. (Tr. 356.)

Mr. Rogers participated in physical therapy on March 25 and 30, 2022. (Tr. 346, 350.) He complained that he "is on toilet for 20 min" and said he was in pain and felt sick. (Tr. 346, 350.) The therapist noted that he was responding well to the exercises and could "address his decreased

11

abdominal and QL stability" through "further skilled intervention." (Tr. 348.) Diet changes were recommended, although it was noted that Mr. Rogers "is not constipated per norms," even though he "does have difficulty passing his stools." (Tr. 352.)

By April 4, 2022, Mr. Rogers had attended all but one of his scheduled physical therapy appointments. (Tr. 337, 343.) He said that, in general, he felt that "things were getting better," although he had regressed in the past couple days. (Tr. 338.) He admitted that he feels like sometimes he may mistake that he "needs to have a BM" with "wanting to have BM." (*Id.*) He has noticed swelling on the lower left side in the mornings and "sits on the toilet for an hour in the mornings." (*Id.*) The therapist noted that Mr. Rogers demonstrated "improvements in stool type, reducing lumbar PS tone, and improving his posture/gait quality," although he continued to be "severely limited in the completion of ADLS." (Tr. 341.)

Mr. Rogers participated in physical therapy on May 3, 2022. (Tr. 333.) He was "more or less the same," having at least one small bowel movement a day and continuing to "work[] out." (*Id.*) The therapist noted that his "progress towards goals is good and his tolerance to treatment is good" but he requires continued care "due to sev[ere] high irritability causing dysfunction in ADLs." (Tr. 335.)

Mr. Rogers underwent a psychological evaluation for purposes of his disability application on May 6, 2022. (Tr. 320.) Mr. Rogers described that he had always had trouble with constipation, but the issue had gotten worse over the past 18 months, leading to weight loss and chronic abdominal and rectal pain. (Tr. 321.) He said he thinks "it might be due to [his] muscles and nerves are dead in [his] rectum" and said that he was in physical therapy to strengthen his muscles. (*Id.*) He described depression and anxiety symptoms related to his pain. (Tr. 322.) He reported that he tries to go to the gym, go outside, or go for an incline walk every morning. (*Id.*) He tries to walk

for an hour or complete "a little job." (*Id.*) He "do[es] anything [his] mother or stepfather needs around the house," including cleaning, cooking, or shopping. (*Id.*) On examination, Mr. Rogers was able to sit still in his chair for the duration of the evaluation and maintained appropriate eye contact. (Tr. 322–23.)

Mr. Rogers underwent a physical therapy re-evaluation on May 16, 2022. (Tr. 327.) The physical therapist noted that Mr. Rogers was unable to use his pelvic floor muscles "despite cues," evaluated that his pelvic floor lengthening ability was "fair," and set a goal to address "rectal hypersensitivity," among other things. (Tr. 327–30.) Mr. Rogers reported improvement after his last therapy session; he "felt really good." (Tr. 328.) The therapist noted that he had attended 12 appointments and missed seven appointments. (Tr. 327.)

By next day, there was "improving impairments and improving functional score," "improved stool consistency and some indep[endence] in having bowel movements without enema." (Tr. 331.) On examination, though, the therapist noted that his "tone still remains very high, and he has cont[inued] poor contraction/relaxation/coordination of PFM due to severe, high, constant tone." (*Id.*) The therapist wrote that he would benefit from continued physical therapy and might benefit from Botox or a Valium suppository. (*Id.*)

X-ray imaging in June 2022 revealed normal anatomy except for colonic redundancy. (Tr. 397–98.) The imaging revealed abnormal pelvic floor movement, though, "which can be indicative of poor pelvic floor coordination secondary to pelvic floor non-relaxation/dyssynergia." (Tr. 398.)

On June 20, 2022, Mr. Rogers consulted with Luke Weber, M.D., complaining of severe pain (up to 10/10 in intensity) in the rectum and lower left quadrant of the abdomen. (Tr. 401–02.) He said his pain was so severe that it causes "brain fog." (*Id.*) Dr. Weber referred him to a surgeon. (Tr. 404.)

Anorectal physiology testing on July 15, 2022, revealed abnormal anal sphincter strength, normal rectal sensation, and abnormal pelvic floor movement. (Tr. 395.) The doctor noted that Mr. Rogers was "well appearing, well-hydrated, [and] well nourished" but  "seems highly emotional about situation and very agitated." (Tr. 397.)

Manometry on August 1, 2022, identified pressure in the gastrointestinal tract that was "well above normal range," which "can indicate high pelvic floor tension." (Tr. 393.) The examination also revealed potential difficulty with pelvic floor movement. (*Id.*) His treating professionals noted that he was a "very anxious young man" and referred him for a behavioral gastrointestinal consultation. (Tr. 394.) The doctor noted that Mr. Rogers needed to restart physical therapy and work on relaxation techniques. (*Id.*)

On August 26, 2022, Mr. Rogers was again evaluated for physical therapy, "after interruption in care." (Tr. 468.) He complained that his symptoms were "way worse," especially with respect to spasms and prolapse. (*Id.*) He described that new medication was helping in the past week, reducing his pain and increasing the normalcy of his stool. (*Id.*) The therapist noted that Mr. Rogers was not independent with self care, had "severe lack in functional abilities" and shown by his inability to take classes or work. (Tr. 471.)

By the end of September 2022, Mr. Rogers said he "has been ok." (Tr. 465.) He was having good days and bad days. (*Id.*) The therapist noted good progress towards goals, good tolerance of treatment, and good understanding of a home exercise program (Tr. 466).

On November 2, 2022, Mr. Rogers underwent a chemodenervation of the internal anal sphincter to inject Botox. (Tr. 667.) He followed up with Dr. Anna Spivak on December 28, 2022, complaining of continued rectal pain. (Tr. 515.) Dr. Spivak reiterated that the best treatment was physical therapy and getting his anxiety under control. (Tr. 516.) She indicated that colostomy was

14

not currently an option, although it would be reevaluated in a year if he continued to have "such severe pain and impact on quality of life" (*Id.*). She recommended evaluation with behavioral medicine professionals (Tr. 517).

Mr. Rogers consulted with Dr. Spivak again on March 20, 2023, complaining of constant pain and continued inability to have a bowel movement. (Tr. 511.) He reported using a wand and suppositories to help him. (*Id.*) He said he is "barely getting out of the house" and has a sensation of pelvic pressure throughout the day. (*Id.*) On examination, he was "very anxious." (Tr. 512.) Mr. Rogers had not followed through on a referral to a psychologist or psychiatrist, and Dr. Spivak again reiterated the importance of that treatment. (*Id.*) Mr. Rogers said he was "ready for surgery," but Dr. Spivak explained that he needs to obtain anxiety treatment prior to any surgical consideration. (*Id.*)

On May 25, 2023, Mr. Rogers consulted with Gina Gerardo, Ph.D., for a behavioral health interview. (Tr. 542.) Mr. Rogers described a sudden onset of symptoms in November 2021. (*Id.*) Dr. Gerardo wrote that he may benefit from "hypnotherapy to reduce heightened sympathetic arousal and hypersensitivity to pelvic/anal/rectal sensations." (*Id.*) Dr. Gerardo also recommended cognitive behavioral therapy and acceptance and commitment therapy. (Tr. 542–43.)

On July 12, 2023, Mr. Rogers consulted with Justin Garyu, M.D., for a second opinion concerning surgery for his pelvic floor dysfunction. (Tr. 838.) Dr. Garyu sought his previous treatment records and ordered an MRI and other tests. (Tr. 838–39.)

On September 2, 2023, Mr. Rogers consulted another surgeon, Jennifer Miller-Ocuin, M.D. (Tr. 875.) On examination, his anus was abnormal with full thickness rectal prolapse noted. (Tr. 878.) Dr. Miller-Ocuin wrote a note indicating, "Psychiatry referral paramount" (Tr. 875).

15

Mr. Rogers followed up with Dr. Miller-Ocuin on November 6, 2023, prior to a surgery scheduled for December 1, 2023. (Tr. 55.) Dr. Miller-Ocuin noted Mr. Rogers's complaints that he takes seven laxatives and a suppository every day just to have a bowel movement, that he is "always having [abdominal] pain," and that he feels that he cannot empty his bowels. (Tr. 55, 58.) On examination, Mr. Rogers's abdomen was flat and soft. (Tr. 59.) Dr. Miller-Ocuin noted that Mr. Rogers had been cleared by psychiatry and, after discussing the risks of the procedure, had elected to proceed with a diverting loop ileostomy procedure. (Tr. 60.)

## IV.     THE ALJ'S DECISION

The ALJ determined that Mr. Rogers met the insured status requirements for a period of disability and DIB through June 30, 2023. (Tr. 20.) The ALJ further determined that Mr. Rogers had not engaged in substantial gainful activity since November 20, 2021, the alleged onset date. (*Id.*)

The ALJ next determined that Mr. Rogers had the following severe impairments: (1) anxiety disorder; (2) depressive disorder; and (3) pelvic floor dysfunction. (*Id.*) The ALJ explained that Mr. Rogers's medical records also contain objective evidence of "minimal" to "mild" gastritis. (Tr. 21.) The ALJ found that this condition was non-severe, reasoning that the condition presented "with no significant upper digestive tract symptoms reported to gastroenterologists" and had been "conservatively managed by prescribed omeprazole medication." (*Id.*) The ALJ noted that he nevertheless considered Mr. Rogers's non-severe impairment in crafting the residual functional capacity. (*Id.*)

The ALJ then concluded that none of Mr. Rogers's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ specifically noted that he considered the digestive disorder listings of section 5.00 of Appendix 1, finding that "the objective medical signs

16

from physical examinations and the results of diagnostic laboratory testing in the record do not meet the specific criteria of any potentially applicable digestive disorders listing, and the evidence does not reasonably support a finding that the claimant's pelvic floor dysfunction . . . medically equal the criteria of these listings or of any other listed impairment (SSR 17-2p)." (*Id.*)

The ALJ further explained his conclusion that "the pelvic floor dysfunction and its documented symptom of weight loss does not meet the criterion of Listing 5.08, *Weight loss due to any digestive disorder*[.]" (*Id.*) And, with respect to listing 5.06, the ALJ found that Mr. Rogers "does not have objectively documented 'inflammatory bowel disease (IBD)' on endoscopy, colonoscopy, tissue biopsy, or imaging findings" and there was "no evidence for obstruction of stenotic areas in the small intestine or colon with proximal dilatation . . ., clinically documented tender abdominal mass on examinations or specified laboratory abnormalities or significant required treatment such as enteral or parenteral nutrition . . ., or 'complications of IBD' of abscesses, intestinal perforation, toxic megacolon, infectious colitis, pyoderma gangrenosum, ureteral obstruction, primary sclerosing cholangitis, or hypercoagulable state . . . ." (Tr. 21–22.)

The ALJ determined that Mr. Rogers had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels" but with the following non-exertional limitations:

> He is able to perform simple, routine, and repetitive tasks but not at a production rate pace (such as assembly-line work) and can make simple work-related decisions; he can have occasional interaction with supervisors and coworkers, but no interaction with the public; and he can tolerate few changes in a routine work setting.

(Tr. 22–23.)

The ALJ found that Mr. Rogers was 21 years old on the alleged disability onset date, had at least a high school education, and had no past relevant work. (Tr. 36.) The ALJ then determined

that—considering Mr. Rogers's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "cleaner II" (DOT 919.687-014), "bagger" (DOT 920.687-018), or "stuffer" (DOT 780.687-046). (Tr. 36–37.) Accordingly, the ALJ determined that Mr. Rogers is not disabled. (Tr. 37–38.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. <u>Standard for Disability</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations

direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

In his assignment of error, Mr. Rogers contends that the ALJ erred when crafting the RFC because the ALJ did not adequately explain how he can perform work on a regular and continuing basis despite his severe impairment of pelvic floor dysfunction. (Pl.'s Br. at 9, ECF No. 8, PageID# 926.) He reads the record to substantiate that he "would require an intolerable amount of time off-task or absences." (*Id.* at PageID# 927.) He points specifically to testing that confirmed

abnormal anal sphincter strength, abnormal pelvic floor movement, and abnormal pelvic floor relaxation with poor pelvic floor descent. (*Id.*) He says that the "record clearly indicates a significant amount of pain which interferes with [his] ability to sit or stand in once place for a significant amount of time" and indicates that he "would require frequent bathroom breaks to attend to his inability to have a bowel movement." (*Id.* at PageID# 928.)

Mr. Rogers also points out that the ALJ noted that the state agency consultants did not consider his pelvic floor dysfunction when rendering their opinions. Citing *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008), he faults the ALJ for crafting the RFC "without guidance [from] a medical source." (Pl.'s Br. at 13–14, ECF No. 8, PageID# 930–31.)

Finally, Mr. Rogers argues that the ALJ failed to address evidence in the record that contradicted the ALJ's findings, making his reasoning as to Mr. Rogers's exertional limitations unclear. (*Id.* at 16 – 17, PageID# 933–34.) The "crux" of his argument in this case, he says, is that "[t]he ALJ's failure to explain why [he] is unimpaired physically despite his severe impairment of pelvic floor dysfunction makes the ALJ's decision impossible to review." (*Id.* at PageID# 934.)

The Commissioner defends the ALJ's decision, arguing that substantial evidence supports the RFC. The Commissioner points out that the ALJ considered Mr. Rogers's statements regarding his symptoms and activities of daily living and "extensively discussed the evidence relating to pelvic floor dysfunction within the RFC assessment." The Commissioner notes that the ALJ found that Mr. Rogers's activities of daily living, "which included going the gym or jogging daily, household chores such as cooking, laundry, and grocery shopping" were inconsistent with his description of the extent of his limitations.

Finally, the Commissioner contends that *Deskin* is not controlling law but says, in any event, here the ALJ had the opinion of the agency consultants at the reconsideration level. The

Commissioner notes that Dr. Murry-Hoffman had pain and "somatic focus" in determining Mr. Rogers's mental limitations (Tr. 117, 199).

In reply, Mr. Rogers reiterates that the ALJ's opinion is fundamentally contradictory, in that the ALJ found a severe condition of pelvic floor dysfunction but did not discuss how that dysfunction affected his ability to perform basic work activities. He claims that the state agency psychological consultant's opinion did not address his significant issues related to pain, high urgency with bowel movements, and fecal incontinence, or his need for repeated bathroom breaks.

After careful consideration, I agree with the Commissioner. Reading the ALJ's decision as a whole allows me to trace his reasoning, and I find that his conclusions are supported by substantial evidence.

As an initial matter, Mr. Rogers's central argument—that there is a *per se* contradiction in the decision because the ALJ found a severe limitation without corresponding exertional limitations—is not well-taken. The finding of a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations in their ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work."). Further, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of

symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

Here, the ALJ carefully explained that he found Mr. Rogers's pelvic floor dysfunction to be severe only in conjunction with his documented mental health conditions.

In explaining this conclusion, the ALJ specifically noted the written statements offered in support of Mr. Rogers's application, which described stomach and bowel conditions causing significant digestive medical issues. (Tr. 25.) The ALJ acknowledged that Mr. Rogers described difficulty with bowel movements and resulting, consistent pain and nausea that left him unable to leave his house. (*Id.*) The ALJ further noted that Mr. Rogers said that he was in a constant state of anxiety because of his intestinal pain and inability to leave the house due to being in the bathroom "all day." (*Id.*) The ALJ acknowledged that Mr. Rogers sought unsuccessfully to manage these conditions through stretching, pelvic massage, diaphragmatic breathing, and an injection. (Tr. 26.)

After summarizing these statements about Mr. Rogers's conditions, the ALJ stated his finding that Mr. Rogers's medically determinable impairments could reasonably be expected to cause the alleged symptoms but his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. (*Id.*)

The ALJ thereafter carefully summarized the medical evidence related to Mr. Rogers's intestinal and pelvic floor conditions over nearly five pages. (Tr. 26–30; 33–36.) Mr. Rogers does not point to any inaccuracies in the ALJ's summary of the evidence, although he argues that the ALJ ignored certain records.

The ALJ's review of the evidence led him to make several conclusions: first, prior to initiation of pelvic floor physical therapy sessions, the objective medical evidence was not

23

consistent with the alleged intensity of Mr. Rogers's pelvic and abdominal pain or its functionally limiting effects; second, that after his therapy started, the therapy was shown to improve his symptoms and he was not compliant with attending physical therapy sessions after the first two months; third, that his treating professionals recommended against more aggressive procedures in favor of continued therapy, that the therapy was more beneficial than alleged, and that his lower GI symptoms "have not been associated with significant objective abnormalities shown on the various diagnostic tests discussed above or with signs on physical examinations of that region." (*Id.*)

The ALJ further noted that Mr. Rogers's statements about his activities of daily living— including that he cannot go out, often turns around when driving to the gym, and relies significantly on his parents—were contradicted at several points in the record. (Tr. 32–33.)

The ALJ thereafter found that Mr. Rogers's pelvic floor dysfunction was only severe when considered in relation to his psychological conditions. (Tr. 30.)

In further explaining his conclusions, the ALJ discussed the prior administrative findings from the state agency consultants. The ALJ found the medical portions of those opinions to be persuasive as to gastritis but not persuasive as to pelvic floor dysfunction. (Tr. 34.) However, the ALJ reiterated that the dysfunction was only severe in combination with Mr. Rogers's mental impairments, explaining that "the expanded medical evidence at the hearing stage of these claims remains generally consistent with no significant work-related exertional, physical non-exertional, or workplace environmental limitations. (*Id.*) He further found the opinion of Dr. Murry-Hoffman to be mostly persuasive, translating her opined limitations into the RFC. (Tr. 35–36.)

I will consider whether the RFC is supported by substantial evidence below, but—contrary to Mr. Rogers's argument to the contrary—the ALJ adequately explained his reasoning such that the Court can engage in a meaningful review.

I am further unconvinced by Mr. Rogers's arguments based on *Deskin*. In *Deskin*, this court announced a rule that "where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Deskin*, 605 F.Supp.2d at 911.

Significantly, however, "*Deskin* has not been universally embraced by courts in this district." *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-cv-1880, 2022 WL 3043060, at *8 (N.D. Ohio Aug. 2, 2022). Indeed, one court in this district has stated that *Deskin* "is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20 CV 1655, 2022 WL 189855, at *2 (N.D. Ohio Jan. 21, 2022) ("*Deskin* has since been critiqued by other courts in this District."). Moreover, the Sixth Circuit has held that requiring an ALJ to base the RFC determination on a physician's opinion "'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)).

As Mr. Rogers noted, in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the court clarified that *Deskin* is "a narrow rule that does not constitute a bright-line test." *Id.* at *2. *Kizys* held that *Deskin* "potentially applies" only where the ALJ "makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Id.*

Following *Kizys*, courts in this district have recognized that "[w]here an ALJ has opinions that account for the majority of the medical evidence, an ALJ may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt residual functional capacity accordingly." *Phelps v. Comm'r of Soc. Sec.*, No. 1:21-CV-02295-BYP, 2022 WL 18395824, at *9 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023). Moreover, "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (*quoting Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

Here, Mr. Rogers has not convinced me that the existing medical sources did not contain sufficient evidence for the ALJ to make a determination or that the record was so complicated that the ALJ required a medical expert to make sense of the evidence.

Significantly, Mr. Rogers does not identify any opinions from a medical source assessing a functional limitation more limited than the RFC. *See Audino v. Comm'r of Soc. Sec.*, No. 4:17CV1594, 2018 WL 3520836, at *8 (N.D. Ohio July 5, 2018), *report and recommendation adopted sub nom. Audino v. Berryhill*, 2018 WL 3496084 (N.D. Ohio July 20, 2018) (rejecting claimant's argument that the ALJ should have obtained medical expert testimony, in part, because the claimant "d[id] not cite to any pertinent limitations opined by any medical source and not addressed by the ALJ").

That failure readily distinguishes this case from *Gunnell v. Kijaki*, No. 3:21-CV-216-JEM, 2022 WL 4783164 (E.D. Tenn. Sept. 30, 2022), relied upon by Mr. Rogers in his briefing. In *Gunnell*, a gastroenterologist specifically opined on significant functional limitations with respect to sitting, standing, and excessive bathroom breaks. *See id.* at *4. Where the ALJ found that opinion persuasive, the court found that the ALJ erred by not including the bathroom break limitation in the RFC or explaining its omission. *Id.* at *5–7. Here, there was no similar opinion in the record before the ALJ.

Moreover, as discussed further above, the ALJ amply and carefully discussed all the records related to Mr. Rogers's conditions throughout the relevant period, including the records that post-dated the consultants' reports. The ALJ discussed test results, the consulting examiner's opinion, physical therapists' notes, and Mr. Rogers's function report, among other records. In other words, the ALJ considered the medical and non-medical sources in the record. *See Williams v. Callahan*, Case No. 97-301, 1998 WL 344073, at *4 n.3 (6th Cir. 1998) (noting that, because the record contained the claimant's extensive medical history, the ALJ did not err in not seeking expert medical testimony); *see also Robertson v. Comm'r of Soc. Sec.*, 513 F. App'x 439, 441 (6th Cir. 2013) (because the record contained test results, physicians' notes, and opinion evidence from

multiple physicians, and lacked any significant inconsistencies in the evidence, the ALJ was not obligated to order a consultative examination with a cardiologist or obtain additional medical records).

This is not a situation where the record "contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion)." *Compare Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008); *see also Seabolt v. Colvin*, No. 5:13-CV-02516, 2014 WL 4093073, at *11 (N.D. Ohio July 17, 2014), *report and recommendation adopted as modified sub nom. Seabolt v. Comm'r of Soc. Sec.*, 2014 WL 4093026 (N.D. Ohio Aug. 19, 2014) ("[T]his case is not so complex that there were questions of medical fact or situations which required the input of a medical expert.").

In other words, the ALJ had before him a full and complete medical record, which contained sufficient evidence for the ALJ to decide Mr. Rogers's disability claim absent medical expert testimony. *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *11 (N.D. Ohio Nov. 26, 2014) (When "the record contains sufficient evidence for the ALJ to decide a disability claim absent expert medical testimony, failure to call a medical expert will not support remand."); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763-SL, 2023 WL 5353142, at *11 (N.D. Ohio Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023) (rejecting claimant's argument that the "esoteric nature" of his condition merited expert testimony because the claimant failed to establish how the existing medical sources did not contain sufficient evidence for the ALJ to make a determination).

Further, the Court is not persuaded that the ALJ should have obtained an expert because he found the state agency consultants' opinions unpersuasive in part. The ALJ extensively discussed how he considered the supportability and consistency of those opinions, a task well within his

expertise. *See Fergus*, 2022 WL 743487, at *9 (holding that "an ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ'") (*quoting Mokbel-Aljahmi*, 732 F. App'x at 401); *see also Borawski*, 2021 WL 811717, at *18 ("The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence.")

The ALJ did not exceed his expertise and "play doctor" here; he considered all the relevant evidence, both medical and non-medical records (including those records that entered the record after the consultant report), and he considered any relevant changes since the consultative examination and state-agency review in coming to his conclusions. *See Reinartz v. Comm'r of Soc. Sec.*, 795 F. App'x 448, 449 (6th Cir. 2020).

Having found the ALJ's explanation of his conclusions adequate, I turn finally to a consideration of whether the ALJ's RFC is supported by substantial evidence. In other words, I consider whether the RFC is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support'" those conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"[A]n ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (*quoting Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v.*

*Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, I am convinced that substantial evidence supports the ALJ's findings and the ALJ did not err in finding that Mr. Rogers's pelvic floor dysfunction resulted in no significant functional limitations.

As discussed further above, the ALJ acknowledged Mr. Rogers's testimony about the extent of the difficulties he experiences, his function report, and his statements to medical professionals over the years about his limitations. The ALJ further identified those places in the medical records where Mr. Rogers had abnormal findings on examination, such as abnormally high tone, abnormal pelvic floor relaxation, abnormal pelvic floor movement, and reduced anal sphincter strength. (*See, e.g.*, Tr. 26.)

However, the ALJ also noted that CT scans, laboratory blood work, a biopsy, and an x-ray showed no significant abnormalities beyond colonic redundancy. (Tr. 27.) He noted that physical examinations in January and February 2022 were normal. (*Id.*) He pointed out that Mr. Rogers

benefitted from physical therapy, yet he missed physical therapy appointments and then stopped attending altogether for a time. (*Id.*) The ALJ found significant that Mr. Rogers's treating physicians largely recommended physical therapy and psychiatric consultations as the best way to address his symptoms, and that there had been "minimal to no pursuit of medication to address the allegedly constant and intense pain" Mr. Rogers says he experiences.

The ALJ also noted Mr. Rogers's activities of daily living, including that he was able to go to the gym three days in the week before his hearing; described taking care of his parents and pets; and indicated that he was able to do chores like laundry, cleaning, and shopping. (Tr. 33.) The ALJ noted that Mr. Rogers's statements were partially inconsistent with themselves and with other evidence in the record. (Tr. 32–33.)

The ALJ thereafter concluded that Mr. Rogers's alleged pain and constipation from pelvic floor dysfunction was not "generally consistent with any significant limitations in exertional, physical nonexertional, or workplace environmental abilities, or consistent with the argued inability to sustain performance of work activity on a regular and continuing basis without needing frequent, unscheduled, and lengthy restroom breaks, without being significantly 'off task' in a given workday, and/or without being absent multiple days per month (SSR 96-8p)." (Tr. 30.)

The ALJ's ultimate conclusions were consistent with the opinion of state agency consultant Dr. Murry-Hoffman, who wrote that Mr. Rogers was "preoccupied [with] chronic health issues" and that his activities of daily living "revolve around perceived limitations," however he "prefers physical explanations [over mental-health] ones." (Tr. 119.) She noted that his "somatic focus" magnifies his mental-health symptoms. (*Id.*)

In conclusion, I am convinced that the ALJ carefully considered the record and that this is a case falling within that "zone of choice within which the decisionmakers can go either way,

without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Accordingly, I recommend that Mr. Rogers's assignment of error be overruled.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  September 19, 2025              /s *Jennifer Dowdell Armstrong*
                                                          Jennifer Dowdell Armstrong
                                                          U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need

conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).